**Signed and Filed: September 28, 2015**



_____
**DENNIS MONTALI**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 13-32456DM |
| ARCE RIVERSIDE, LLC, | ) |
| | ) |
| Debtor. | ) Chapter 11 |
| _____ | ) (Jointly Administered with |
| In re | ) Case No. 13-32457) |
| | ) |
| KERA RIVERSIDE, LLC, | ) |
| | ) |
| Debtor. | ) |
| _____ | ) |

**MEMORANDUM DECISION ON OBJECTION TO SECOND AMENDED CLAIM**

I.   INTRODUCTION

On September 1st and 2nd, 2015, the court conducted a trial on the Debtors' Objection to the Second Amended Claim of Penn Equities, LLC, ("Penn"), and on September 3rd the court heard closing argument from counsel for the parties.  At that point the matter was submitted for decision.  The court then asked for further briefing on a discrete question, discussed, _infra_.

As explained below, the court will sustain the objection and enter an order disallowing the interest paid and ordering it repaid to Debtors (subject to possible offset); it will not award treble damages.  Based upon this result, the court determines that

-1-

1  the prevailing parties, Debtors, are entitled to an award of

2  attorneys fees and costs, which should be the subject of a

3  separate motion.

4  II.  FACTS[1]

5      George Arce ("Arce") is the managing member of Debtor, Arce

6  Riverside, LLC.  He is a California licensed real estate broker

7  and salesperson.  Neil Wachsberger ("Wachsberger") is the managing

8  member of Debtor, Kera Riverside, LLC.  He is also a California

9  licensed real estate broker.  Arce Riverside, LLC and Kera

10 Riverside, LLC at all material times owned real estate in

11 Riverside, California ("the Property").

12     In 2007 Debtors borrowed $3.5 million on a Promissory Note

13 (the "CIBC Note") (Exhibit B) from CIBC Inc., ("CIBC)", a bank

14 affiliate that was then the holder of a California commercial

15 finance lenders license.  No evidence suggested that Arce acted as

16 the broker for this loan, nor on Debtors' 2004 acquisition of the

17 Property.

18     The CIBC Note contains in Paragraph 5, Default and

19 Acceleration, a prevailing party's attorney fee provision that the

20 parties agree is applicable to the outcome of the present dispute.

21 An unnumbered paragraph, Applicable Law; Jurisdiction, provides a

22 choice of law, namely the state in which the Property is located.

23 Thus California law applies.

24     The CIBC Note was secured by a first deed of trust on the

25 Property.  It was modified in 2009 at a time when the principal

26 balance was slightly more than $2.4 million.

27  _____

28     [1] The following discussion constitutes the court's findings
   of fact and conclusions of law.  Fed. R. Bankr. P. 7052(a).

-2-

The CIBC Note had matured by August 2010, although CIBC did not declare a default, institute foreclosure, or apply a default rate of interest. This situation was reflected in several written communications between CIBC and Debtors (Exhibits L, M & N). Debtors continued to make interest-only payments on the CIBC Note at approximately four percent.

Prior to February 14, 2011, Arce negotiated a letter of intent with a prospective lessee of the Property, Crunch Fitness ("Crunch"). Because Wachsberger had a prior working relationship with Hank Dayani, Arce called upon him to discuss with Hank Dayani a prospective $350,000 loan to Debtors to finance tenant improvements at the Property in anticipation of Crunch becoming the lessee. Wachsberger drafted a letter of intent to that effect for Luxor Properties, Inc. to submit to Debtors.

Hank Dayani discussed Wachsberger's request with his brother, H. Sean Dayani ("Dayani", and together with Hank Dayani, the "Dayani brothers"). The Dayani brothers are co-owners of several entities including Luxor Properties, Inc. and Dayco Funding Corporation ("Dayco"), a California licensed real estate broker. They each own 50 percent of the shares of Dayco. They also each have a 25 percent membership interest in Penn; the remaining 50 percent is owned by Don R. Hankey ("Hankey"). At the time of the preliminary discussions and later at the time of the loan modification, discussed *infra,* Penn did not have a California finance lenders license or a California real estate brokers license.

On April 20, 2011, Dayani, on behalf of Dayco, as a principal, approached CIBC with an offer to purchase the CIBC

-3-

Note.  Dayani drafted the initial proposal; Arce suggested changes

including an increase in Dayco's proposed purchase price from

$2,000,000 to $2,100,000.  (Exhibit T(A)-1).  When he agreed to

some of Arce's suggested changes, Dayani wrote to Arce:

> Ok, dayco (sic) is buying the loan, correct?? So, from
> now on, dayco (sic) is in charge what is buying and how
> it goes about it. ok??  Since I can not spend more time
> on this, I will go along with this but sorry, from now
> on I have to deal with the lender and you will be
> informed as to my progress but how the deal gets done is
> my business. You will know about the purchase price and
> timing. In terms of how we will modify the loan, you
> have every right to get a term sheet and approve it and
> your attorneys will have the right to take a look at the
> loan modification docs and comment.

(Exhibit T-1)(Emphasis added).

On April 29, 2011, the Dayani brothers, Arce and Wachsberger

met and discussed what the parties have called the Three Options

Memo (Exhibit W).  The three options proposed in that memo were:

1.  a loan by Dayco to Debtors in the amount of $2 million;

2.  a loan by Dayco to Debtors in the amount of $400,000 for
tenant improvements, secured by a second deed of trust on the
Property;

3.  Dayco and/or its investor affiliate Penn would purchase
the CIBC Note and modify it to provide for a reduced principal
balance of $2.31 million at an interest rate of 12 percent for a
term of one year with no prepayment penalty.  Arce and Wachsberger
would guarantee the modified note.

The second option was a variation on the earlier proposal

drafted for Luxor Properties, Inc.  The third option, setting

forth what later became the basis of the modification of the CIBC

Note when it was acquired by Penn, was proposed by Dayco.  At the

time of that proposal it was not engaged to act as a broker for

Penn nor was it acting for Penn.  In fact, there was no discussion

about Penn or about Dayco, Dayani, Arce or Wachsberger acting as a

broker in any capacity.  Dayani knew that Arce and Wachsberger

-4-

were acting as principals.

A few days after the meeting, Arce sent an email to the Dayani brothers, stating that "[Wachsberger] and I have made the decision to go with option 3." He did not express any choice between Dayco or Penn to purchase the CIBC Note and to modify it. Thus, the choice was entirely up to Dayco. That was the last time Debtors had anything approaching a negotiation about the critical elements of forbearance, namely the extension of the maturity date of the CIBC Note and the increase of the interest to twelve percent.

Dayani testified that he was planning for Dayco to act as Penn's agent, but there is no evidence that it actually did so. In fact, Dayco did not file with the California Department of Real Estate or deliver to Penn any of the documents required of a broker acting in such a capacity. Dayani's self-serving testimony that he did not need to report anything to himself is consistent with Debtors' contentions and the court's determination that it was not acting as Penn's broker or agent at all.

Penn offered into evidence an Agreement Regarding Loan Purchase, Placement of Modification and Servicing (the "Broker Agreement") (Exhibit Y), dated as of June 1, 2011.[2] The Broker Agreement was signed by both Dayani brothers, on behalf of Dayco and Penn, and Hankey, Penn's other member. Among the recitals was

---

[2] Debtors argued strenuously that the Broker Agreement was fabricated after-the-fact to provide a defense to their usury claim. But all Debtors have is inference and innuendo, and the testimony of Hankey who could not recall such an agreement ever being entered into before. That is not enough for the court to find any date of execution other than June 1, 2011, but based upon the court's decision, the date is not pertinent.

-5-

a statement that Dayco had already informed CIBC and Debtors that Penn would purchase that CIBC Note. That recital was untrue. There is no evidence that CIBC or Debtors were aware of that intention until September, 2011. Further, there is no evidence that as of June 1, 2011, Dayco had been negotiating on behalf of anyone other than itself.

Penn uses the Broker Agreement to establish that Dayco was engaged as the licensed broker for Penn as principal. If so, as discussed, *infra*, the modification of the CIBC Note would be exempt from the usury laws. To further bolster its case, Penn points to Paragraphs 3 and 4 of the Broker Agreement, wherein it contends that Dayco has become entitled to $50,000 as a fee for its services as the loan broker. Those two paragraphs provide as follows:

> 3. Beside the benefits which [the Dayani brothers] will receive from Penn as members of Penn and the only two (2) shareholders of Dayco, Dayco shall be entitled to receive the sum of $50,000.00 from Penn when the Loan is fully paid off. Penn shall also reimburse Dayco fully for all of its expenses related to the modification;

> 4. In the event Penn is forced to foreclosure (sic) upon the Property, then Dayco shall be entitled to the following compensation: (I) if the Property is sold at the trustee's sale to a successful bidder, then Dayco shall be entitled to $50,000.00 from the proceeds, (ii) if the Property is reverted back to Penn, then Dayco and Penn shall enter into a separate Asset Management Agreement, in which Dayco shall manage the Property, market the Property and eventually sell the Property. Regardless of the management fee negotiated by the parties, Dayco shall be entitled to receive the sum of $50,000.00 from the net sale proceeds, regardless of the selling price.

Since there never was a foreclosure sale of the Property,

-6-

paragraph 4 is not applicable, and the only source of Dayco's
compensation is paragraph 3.

In Recital E of the Broker Agreement, the parties state that
Dayco shall continue to negotiate with CIBC

"and at the same time discuss modification terms and
conditions with [Debtors] on behalf of Penn and upon the
purchase of the [CIBC Note], negotiate, finalize and
place the modification on behalf of Penn ..."

The first paragraph setting forth the parties' agreement
tracks the same language quoted above.

Presumably these recitals described what Dayco would do "on
behalf of Penn" and for which it would have an expectation of
compensation under paragraph 3.

On August 16, 2011, Dayco and CIBC entered into a Loan Sale
Agreement (Exhibit BB). That agreement contemplated that Dayco
would purchase the CIBC Note from CIBC as of August 31, 2011, and
included as exhibits several documents the parties intended to
sign at the closing of the loan purchase. There is nothing in
that agreement about Penn.

In fact, Section 3.05, entitled "No Broker" states that Dayco
nor any of its affiliates has dealt with, or engaged on its own
behalf or for its benefit, any broker, agent or dealer entitled to
a commission or a fee. And Section 7.05(a) states that the
parties to the agreement are the sole and exclusive beneficiaries
of it. Again, there was no suggestion or intimation that Dayco
was acting for anyone else.

Shortly thereafter, on September 12th, Arce and
Wachsberger learned that Penn would actually acquire the CIBC
Note. Dayani made the decision for Penn. The acquisition

-7-

occurred, effective September 16, 2011.

On the date Dayco assigned its rights in the Loan Sale Agreement to Penn and Penn and CIBC completed the sale of the CIBC Note to Penn (Exhibit EE), with formal notice given to Debtors (Exhibit FF).

Four days later, on September 20, 2011, the Debtors and Penn executed a document entitled Basic Terms and Conditions Regarding Loan Modification ("Term Sheet") (Exhibit GG), which was prepared by Dayani on behalf of Penn. While Penn makes much of the fact that the letterhead of the Term Sheet shows Penn "c/o" Dayco, Dayani signed as "Managing Member", a title he had in Penn and not Dayco. The letterhead proves nothing. The only other mention of Dayco in the Term Sheet is a statement that it is not waiving any rights. In fact, the Term Sheet directed Debtors to pay delinquent real property taxes ($21,219.63) to Penn, and also to pay the increased interest ($23,100) and $8,500 for the August 10 - September 10 CIBC Payment.[3] It also pointed out that the payments being demanded of Debtors did not cover the October 16, 2011, payment of interest. There was no mention there that Dayco had any role in the ongoing relationship. On September 21, 2011, however, Dayco informed Arce that it would be servicing the CIBC Note.[4]

---

[3] CIBC was only owed $8,000. The court finds the $500 discrepancy to be an innocent error having no bearing on the outcome of this case.

[4] The parties agree that a loan servicer needs to have a license but Dayco's legal ability to service the CIBC Note is not relevant to Debtors' usury claim. As discussed in the text, Dayco did not act as an agent in connection with the forbearance of the CIBC Note.

-8-

Before the definitive Agreement Regarding Loan Modification ("LMA") was finally executed on January 3, 2012 (Exhibit QQ), the parties acted as though the provisions of the Term Sheet were in effect.  Debtors began paying the increased rate of interest ($23,100 per month) and the one-year extension had begun.  In the months following the acquisition of the CIBC Note and up to the execution of the LMA, Dayani negotiated additional terms (other than the interest rate increase, principal reduction and one-year extension that were set forth in the Three Options Memo) of the modification on behalf of Penn, dealing with Debtors' real estate counsel, Judith Rentschler.  The foreclosure aspects of the modification had already been fully negotiated.

One of the Terms and Conditions of the LMA is ¶ E.  After nine lines of boilerplate language, the paragraph concludes with the following sentence:

> "Borrower acknowledges that this Agreement has been *negotiated on behalf of the Lender, Dayco Funding Corporation, a California corporation,* which is licensed by the California Department of Real Estate (License number :01167099)."  (Emphasis added)

Debtors have seized on the emphasized recital that Dayco is the Lender.  That interpretation, however, is not consistent with the preamble to the LMA which identifies Penn as the Lender.  The court believes that a fair reading of the quoted language would imply the word "by" before "Dayco."  The real question before the court, however, is whether Dayco in fact had been negotiating a forbearance on behalf of Penn.  The mere recital does not make it so.  Nor does the evidence.

Penn and Debtors later negotiated an Agreement Regarding Loan Extension in April, 2013 (Exhibit ZZ).  In Terms and

-9-

Conditions, ¶ E, the same boilerplate language quoted from ¶ E of
the LMA appears except this time there is no recital about Dayco
acting as broker. Maybe the omission was an oversight; more
likely it confirms the court's finding that Dayco had not acted as
Penn's agent or broker.

From September, 2011, until March, 2012, Debtors paid Penn
interest in the total amount of $164,380, including three post-
dated checks of $5,000 each in later 2011.[5] They also paid a
$25,000 extension fee in April, 2013. (Wachsberger testimony).
This totals $189,380 they hope to recover for payments made
outside of the one-year period for which they claim treble
damages.

In March, 2012, with the consent of Penn, Debtors obtained
secondary financing from MIC Infinity Fund, LLC ("MIC"). MIC made
thirteen interest advances of $23,100 per month directly to Penn
from April, 2012, through April, 2013, for a total of $300,300.
(Wachsberger testimony). While MIC is an exempt lender, and
charged Debtors a higher rate of interest on these advances,
Debtors reimbursed MIC later for the $300,300 that was paid to
Penn as interest, and correctly they include that total in the
amount they seek to recover from Penn.

Subsequently Debtors went into default, Penn initiated
foreclosure of the Property, and Debtors filed these chapter 11
cases on November 12, 2013 to stop the foreclosure.

In the course of the chapter 11 cases Debtors made one

_____

[5] Debtors paid Penn $8,500 in September, 2011, of which
$8,000 was forwarded to CIBC. The remaining $500 has been
disregarded. See footnote 3.

-10-

monthly interest payment of $23,100 to Penn.  Then the Property
was sold, effective January 23, 2015.  Concurrent with the close
of escrow, Debtors paid additional interest of $40,000 to Penn
from their debtor-in-possession account.  According to the closing
statement (Exhibit CCC) Penn received $3,158,067 plus interest of
$2,181.[6]  The principal portion of that total owing to Penn on the
CIBC Note, as modified, was $2,310,000.  Because Penn had acquired
the note for $2,100,000, Debtors contend that the principal
discount, $210,000, is recoverable as usurious interest.[7]  Thus
they believe that they can recover the following amounts they paid
(interest except where indicated otherwise):

| Date | Paid By | Amount |
|---|---|---|
| Sept, 2011 - Mar, 2012 | Debtors | $ 164,380 |
| April, 2013 | Debtors – extension fee | $  25,000 |
| April, 2012- April, 2013 | MIC | $ 300,300 |
| January, 2015 | Debtors | $  23,100 |
| January, 2015 | DIP Account | $  40,000 |
| January 23, 2015 | Debtors – Principal Discount | $ 210,000 |
| January 23, 2015 | Debtors - COE | $ 848,067 |
| **TOTAL** | | **$1,610,847** |

Penn filed a Second Amended Claim (Claim No. 4-2) on December

_____

[6] The closing statement reflects this additional interest at
$1,093.83 per day for two days.  Debtors did not include this
small payment in their calculations of usurious interest so the
court will ignore it.

[7] They say nothing about Penn's voluntary reduction of the
principal from over $2,400,000 to $2,310,000.

-11-

1   15, 2014, and Debtors filed their Objection to Second Amended
2   Claim on February 19, 2015 (Dkt. No. 174).

3       Pursuant to Stipulation Re Trial Issues and Scheduling filed
4   on March 18, 2015 (Dkt. No. 184), Debtors, Penn, Wachsberger and
5   Arce and Antonette Arce, individually and as Trustees of the Arce
6   Family Trust dated October 17, 2012, as Guarantors, agreed that
7   this court could adjudicate the dispute involving whether or not
8   the California usury laws had been violated and the right of
9   either Penn or Debtors to an award of attorneys fees and costs.
10  The parties also agreed that the court could enter a money
11  judgment in favor of the prevailing parties and against the losing
12  parties.  There is a cap of $3,198,067, which the parties agree is
13  the total amount paid to Penn during these bankruptcy cases.  The
14  cap does not apply to any award of attorneys fees and costs.
15  III.  DISCUSSION

16      **A.   California Usury Law**

17      The parties have briefed the California usury law applicable
18  to the present dispute, including the statutory safe-harbor that
19  Penn believes protects it from Debtors' challenge.  Only a brief
20  summary is in order.

21      The California Constitution, Article XV, section 1, states
22  that a party may not charge a fee, bonus, commission, discount or
23  other compensation from a borrower more than the interest
24  authorized by that section "upon any loan or forbearance of any
25  money, goods or things in action."  The parties agree that the
26  maximum rate applicable here, absent an exemption, is ten percent.
27      In California Civil Code § 1916.1, ("CC 1916.1") the
28  California legislature has provided an exemption from the

-12-

applicability of the California Constitution's proscription on charging usury by exempting "any loan or forbearance made or arranged" by a licensed real estate broker, and secured by real estate.  That section provides, in part, as follows:

> For purposes of this section, a loan or forbearance is arranged by a person licensed as a real estate broker when the broker (1) acts for compensation or in expectation of compensation for soliciting, negotiating, or arranging the loan for another, (2) acts for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business for another and (A) arranges a loan to pay all or any portion of the purchase price of, or of an improvement to, that property or business or (B) arranges a forbearance, extension, or refinancing of any loan in connection with that sale, purchase, lease, exchange of, or an improvement to, real property or a business, or (3) arranges or negotiates for another a forbearance, extension, or refinancing of any loan secured by real property in connection with a past transaction in which the broker had acted for compensation or in expectation of compensation for selling, buying, leasing, exchanging, or negotiating the sale, purchase, lease, or exchange of real property or a business.

Calif. Civ. Code, § 1916.1 (Emphasis added).

The California Supreme Court has made abundantly clear that:

> The intent sufficient to support the judgment [of usury] does not require a conscious attempt, with knowledge of the law, to evade it.  The conscious and voluntary taking of more than the legal rate of interest constitutes usury and the only intent necessary on the part of the lender is to take the amount of interest which he receives; if that amount is more than the law allows, the offense is complete.

*Ghirardo v. Antonioli*, 8 Cal. 4th 791, 798 (1994), quoting *Thomas v. Hunt Mfg. Co.* 42 Cal. 2d 734, 740 (1954).

The *Ghirardo* court also recites at least three other principles that are pertinent here.  First, intent is relevant in determining the true purpose of the transaction in question because the trier of fact must look to the substance of the

-13-

transaction rather to its form.  Second, a transaction is rebuttably presumed not to be usurious.  Third, the borrower bears the burden of proving the essential elements of a usurious transaction.  *Ghirardo v. Antonioli*, 8 Cal. 4th, at 798-99.

**B.   What is a Forbearance?**

Penn argues that the LMA was a modification of the CIBC Note, and thus it is not a forbearance.  The court accepts Penn's contention that the CIBC Note was modified and that the LMA was a modification; that does not mean that the modification did not include a forbearance.

A forbearance is an agreement not to insist upon payment at the date of maturity of a debt, or the giving of further time to pay.  *Buck v. Dahlgren,* 23 Cal. App. 3d 775, 785 (1972), citing Witkin, Summary of Cal. Law (7th Ed. 1960) pp. 183-184 and *Calimpco Inc. v. Warden*, 100 Cal. App. 2d 429 (disapproved on other grounds *Fazzi v. Peters*, 68 Cal. 2d 590) and *Eisenberg v. Greene*, 175 Cal. App. 2d, 326.

In *Buck* the creditor agreed to postpone a trustee's sale from November 6, 1967 until December 6, 1967 for the sum of $500.  By that payment, the borrower was given one month further in which to pay the matured loan.  Consequently the creditor received .99 percent of a $50,560 debt for a one-month forbearance, or an annual usurious rate of nearly twelve percent.  Here, the one-year extension of the maturity of the CIBC Note was a forbearance, albeit part of a more detailed modification of Debtors' obligations.  *DCM Partners v. Smith*, 228 Cal. App. 3d 729 (1991) is of no help to Penn.  That case involved a credit sale, not a forbearance of a loan of money.  The increase of the interest to

-14-

twelve percent (over the maximum rate of ten percent) implicated California usury law.

### C. A Licensed Real Estate Broker Acting as a Principal is Not Exempt

When a licensed real estate broker acts as a lender, and not as the agent for another, the statutory exemption of CC 1916.1 does not apply. For example, in *Winnett v. Roberts*, 179 Cal. App. 3d 909 (1986), a licensed real estate broker made the loan in question. The court held that in a transaction between a borrower and a lender, each acting on its own behalf, where there is no third party licensed real estate broker acting for compensation as intermediary, the loan is not "arranged" by a broker within the meaning of the usury law. 179 Cal. App. 3d at 921. Here, the forbearance contained in the Three Options Memo that Debtors accepted was negotiated by Dayco acting for itself, not as a third party broker. It was its later choice alone to have Penn take its place. No loan was "made" by anyone except CIBC years earlier so the focus is on the "forbearance."[8] But what does it mean for a loan (or forbearance) to be arranged?

In *Creative Ventures LLC v. Jim Ward & Associates*, 195 Cal. App. 4th at 1430 (2011), the court described what is involved when a broker "arranges" a loan:

> Broker 'arranged' loans are those in which the broker acts as an intermediary and causes a loan to be obtained or procured as by structuring the loan as the agent for the lender, setting the interest rate and points to be paid, reviewing the loan and forbearance documents, conducting title searches, or drafting the terms of the loan.

---

[8] See discussion, *infra,* whether a forbearance arranged under these circumstances is exempt in any event.

-15-

*Creative Ventures*, Id., citing *Gibbo v. Berger*, 123 Cal. App. 4th 396 (2004).

    **D.    One Can Act as a Broker for Another When Acting for a Wholly Owned Corporation or Other Form of Entity**

In *Stickel v. Harris*, 196 Cal. App. 3d 575 (1987), a broker was acting on his own behalf and on behalf of certain fellow partners when they borrowed from a lender and later challenged the loan as usurious. The court distinguished the *Winnett* situation and concluded that the involvement of a licensed broker, not acting exclusively as a borrower, but simultaneously acting as an agent soliciting the loan on behalf of others, was sufficient to trigger the CC 1916.1 safe harbor. The benefit to the broker's partnership and his expectation of a pro rata share of ultimate profits was sufficient to satisfy the statute's requirement that the broker be acting on behalf of another for compensation, or expectation of compensation.

Stated otherwise, the compensation can be satisfied by an indirect benefit to an entity owned or controlled by the licensed broker. See, also *Bock v. California Capital Loans, Inc.*, 216 Cal. App. 4th 264 (2013); *Stoneridge Parkway Partners v. MW Housing Partners III*, 153 Cal. App. 4th 1373 (2007).

Here, had Dayani acted as a third party broker for Dayco, or later had either he or Dayco acted as a third party broker for Penn, the CC 1916.1 defense would be available. The "expectation of compensation" element would have been satisfied. That is not what happened. Dayco, then Penn, acted as principals. The Broker Agreement is of no help since its recitals of Dayco's role vis-a-vis Penn are simply not so.

    **E. Debtors are not estopped from raising the usury defense.**

-16-

Penn argues that Debtors acted in bad faith and with unclean hands by signing documents that purported to comply with law and by waiving defenses, claims and offsets. Those arguments are not convincing.

> In order to effectuate the statutory policy of protection, the courts have also regularly held a borrower and a lender are not *in pari delicto* in a usurious transaction and the lender may not assert an estoppel against the borrower simply because the borrower took the initiative in seeking the loan, knew of the usurious nature of the transaction, and paid usurious interest without protest.

*Buck v. Dahlgren* (1972) 23 Cal. App. 3d 779, 787 (citations omitted).

Penn has cited to cases that apply estoppel to assert usury by borrowers. But a common theme in those cases is the questionable conduct of the borrower in connection with the original transaction who later makes the usury claim. For example, in *Buck, supra,* the court imposed the principle of estoppel on a borrower, a real estate developer, whose conduct it described as "avaricious machinations" (23 Cal. App. 3d at 790). The borrower was in full control of the transaction and made fraudulent misrepresentations to the lender, an individual from another country with little experience in real estate lending. He knowingly withheld information about the true value of the real estate collateral and his intentions about repaying the loan.

In *Lakeview Meadows Ranch v. Bintliff,* 36 Cal. App. 3d 418 (1973), the principal of the borrower was an attorney who was selected to draft the operative document because of his knowledge of California law. The lender plainly lacked an intent to charge an unlawful amount and the borrower, who did not suggest the agreement was unlawful, believed that what he drafted conformed to

-17-

the law and did not suggest to the lender that it did.  That
conduct created an estoppel against the borrower's usury claim.

Here, Ms. Rentschler was hired for a limited purpose of
reviewing the document Dayani drafted (the LMA).  Dayani was the
author of that document and he accepted few of her suggested
changes.  She had little effect on the final version the parties
signed.  She believed the transaction had been brokered by Dayco,
a licensed broker, because the agreement said so and she had no
reason, nor was she hired, to question that recital.  Had she
known otherwise, maybe the outcome would be different.  On the
record presented, there is no reason for denying Debtors the
relief they seek based upon estoppel.[9]

**F.  Penn has no defense under CC 1916.1.**

As noted above, after trial the court asked for further
briefing on a very discrete question.  That question was:

> "Where is there a statutory exemption that extends to a
> licensed real estate broker's "arranged" forbearance
> other than one that relates to a sale, etc., of property
> or a business or to a past transaction?"

Both parties submitted briefs as requested.  Having reviewed
those briefs, the court is satisfied that the Debtors are correct
and that the California legislature has very narrowly defined the
type of forbearances that may be arranged by a licensed real
estate broker and thus be exempt from the usury laws.

CC 1916.1 extends the usury exemption, in its opening
sentence, to "any loan or forbearance" made or arranged by a
licensed real estate broker.  The second sentence narrows the

---

[9] Penn has conceded that release provisions in the various
documents to not apply to a release of usury claims as a matter of
public policy.

-18-

field where it indicates that "for purposes of this section" the exemption applies only in three circumstances. The first applies to a loan (not applicable here). The second applies to "selling, buying, leasing, exchanging or negotiating the sale, purchase, lease, or exchange of real property or a business for another" and the broker either (A) arranges a loan or (B) "arranges a forbearance" in connection with that sale, purchase, lease, etc. That second alternative is not applicable here either since there was no sale, lease or exchange of the Property.[10] The third exemption is found where the broker "arranges or negotiates for another a forbearance, extension, or refinancing of any loan ... in connection with a past transaction in which the broker had acted for compensation."

Note that there are only two instances of forbearance mentioned: in connection with a sale and in connection with a past sale in which the broker acted as such. Neither occurred here.

Penn would have the court apply the "past transaction" exception of CC 1916.1(3) to the fact that Arce was involved in the original acquisition of the Property and in arranging and negotiating the CIBC Note. Penn overlooks the qualifying language in the statute that the broker to be exempt in a present transaction must have been the broker in the prior transaction. Arce was not the broker in the present transaction, as discussed, *supra*, and he acted only as a principal in the negotiations to acquire the Property and later to borrow from CIBC.

Penn points to the legislative history and finds that the

---

[10]The lease of the Property to Crunch is irrelevant to the usury analysis as it did not involve Dayco or Penn.

-19-

phrase "for purposes of this section" only sets forth examples because the word "only" is not present. Penn does not want the court to insert that word "only" but it does want the court to insert "for example." It is axiomatic, however, that the court is obligated to apply the words of the statute without consulting legislative history, ballot initiatives, or other secondary sources when the language is clear. Here the language is clear. There are only two types of forbearance that are exempt.

The court assumes the Legislature "knew what it was saying and meant what it said." *Del Mar v. Caspe*, 222 Cal. App. 3d 1316, 1328 (1990), quoting *Pac. Gas & E. Co. v. Shasta Dam etc. Dist.*, 135 Cal. App. 2d 463, 468. If it wanted the section merely to "include" the stated examples it certainly could have. The court cannot graft the expansion Penn seeks into the limiting words "for purposes of this section."

From the foregoing the court concludes that there is no exemption for a forbearance that was granted here under CC 1961.1 and that Penn's defense must fail.

**G. Even if CC 1916.1 applies, the result is the same**

Penn cannot prevail even if its interpretation of CC 1916.1 is correct.

**1. The acquisition of the CIBC Note**

The critical event in this case has to do with the forbearance, originally found in the Three Options Memo, then set forth in the Term Sheet, and finally reflected in the LMA. The negotiation by Dayco to acquire the CIBC Note from CIBC is of no consequence. In any event, as summarized, *supra*, Dayco was acting on its own behalf until the time it assigned its contractual

-20-

rights to Penn in September, 2011.  While the usury laws are not implicated in that first transaction, had they been, Dayco could not have claimed an exemption because it was acting on its own behalf and the fact that it was a licensed broker is of no moment. That is all irrelevant.

### 2.  The Broker Agreement

When Penn and Dayco, joined by Hankey, signed the Broker Agreement they purported to acknowledge in some fashion that Dayco would be acting on behalf of Penn.  Taking that agreement at its face, it does say that Dayco will discuss modification terms with Debtors "on behalf of Penn" and after the CIBC Note is acquired, it will "negotiate, finalize and place the modification" on behalf of Penn.  It is not unreasonable to say that the $50,000 compensation was contemplated or expected for those functions Dayco was to perform.

While language in the Broker Agreement comes close to describing the expectations of the parties as to the role Dayco might have played in connection with the acquisition of the CIBC Note by Penn and the subsequent modification with the Debtors, the facts betray those expectations.

As Dayani made clear to Debtors in Exhibit T-1, Dayco was buying the CIBC Note; Dayco was in charge!  Thus by early May, 2011, the new twelve percent interest rate and the one-year extension of maturity had been arranged – but not by a third party broker.

Dayco acted solely for itself up until Penn took over its position and acquired the CIBC Note.  Thereafter, Penn handled all of the remaining modifications on its own.  Dayani acted solely

-21-

for Penn, as shown in the Term Sheet and the LMA. In any event, the forbearance, namely the extension of time and the increased interest, had been negotiated by Dayco in April 2011, acting solely on its own. Penn and Dayco's attempts to paper the arrangement in the Broker Agreement fail based on the events as they occurred.

### 3. The Assignment from Dayco to Penn

In connection with the payoff to CIBC, Dayco assigned all of its contractual rights to Penn and CIBC transferred the CIBC Note to Penn, with Penn providing the agreed consideration both from its own funds and from money borrowed from one of Hankey's business entities. That transaction is of no particular relevance to the issues presented here since it did not require the involvement of a licensed California real estate broker nor did it implicate the usury laws.

### 4. The Term Sheet and the Ultimate LMA Constituted a Forbearance and a Modification

Dayani proposed the Three Options Memo on behalf of Dayco and later drafted and executed the Term Sheet on behalf of Penn. Thus, any contention that Dayco was negotiating or "arranging" the modification and the included forbearance is not found anywhere in the documentation. The after-the-fact recital by Dayani that he was acting in dual capacities is insufficient for the court to find to the contrary. The later obtaining of a California licensed finance lender license by Penn was too little too late. *Whittemore Homes, Inc. v. Fleishman,* 190 Cal. App. 2d 554 (1961), *Westman v. Dye*, 214 Cal. 28 (1931).

Based upon the authorities cited above, the negotiation of

-22-

the terms of the forbearance, either as originally set forth by Dayani on behalf of Dayco in the Three Options Memo, or ultimately formulated in the Term Sheet between Penn and Debtors, or the ultimate LMA between the same parties (and others), involved one principal then another acting on its own behalf. Thus cases such as *Stickel* and *Park Terrace Ltd.* offer no consolation to Penn because there simply was no broker involved at all. *Buck* and *Winnett* compel the court, on the facts presented, to conclude that there is no exemption under CC 1916.1 available to Penn, assuming it applies at all.

Penn intended to collect twelve percent interest. Debtors have carried their burden and rebutted the presumption against usury and they are entitled to recover the interest they paid.

**5. What damages may Debtors recover?**

Debtors contend that because Penn acquired the CIBC Note at a $210,000 principal discount, they should recover that $210,000 as part of their usury damages. That is not a convincing argument.

In *Lee v. Marchetti*, 4 Cal. App. 3d 97 (1970), the court dealt with a situation where a series of transactions supported an inference that the parties were involved, albeit for different motives, in a conspiracy to evade the usury laws. There the court reversed a grant of summary judgment and remanded the matter for trial to determine the material facts in support of a discount of a note. In doing so the court described a situation more like the present case. It indicated that the purchase of a note at a discount does not, per se, prove that a transaction is usurious. One who loans $100,000 and takes back a note in that amount can sell it to another for $75,000. The buyer has not loaned the

-23-

money at the discounted rate of twenty-five percent, but has simply purchased the debt at a discounted price. 4 Cal. App. 3d at 101-102, citing *Janisse v. Winston Investment Co.*, 154 Cal. App. 2d 580, 582.

The court went on to indicate that if the original note holder is a dummy, and if in fact the form of a transaction is a sham and subterfuge to cover up a loan from the discount-buyer to the original borrower, then the discount is deemed to be usurious interest.

In this case, Debtors received all of the money loaned by CIBC; the fact that Penn acquired that loan at a discount does not suggest anything other than the simple hypothetical identified in *Lee v. Marchetti*. There is no evidence of any sham transaction; Debtors received the total amount they borrowed; the usury laws were violated with the forbearance's extension of the maturity date and increase of the rate of interest on the CIBC Note that represented the full amount still owing by Debtors. The $210,000 discount will be disallowed as part of Debtors' damage claim.

Debtors also seek to recover the $25,000 extension fee. In their trial brief they did not articulate a reason why that should be part of their recovery. An extension of maturity of a debt is not itself usurious. For these reasons, the court will not allow that amount.

In their trial brief Debtors subtract from their damage summary $75,144.00 paid to Penn's counsel as legal fees, then they add that amount back in, plus $51,043.00 apparently paid outside of escrow. These items have not been explained either in the briefs or the Debtors' witnesses' testimony. For that reason they

-24-

will not be allowed as part of Debtors' recovery.

The remaining amount, representing the total amount of interest paid, ($1,610,847 - $210,000 and - $25,000 = 1,375,847), subject to possible offset discussed, *infra*, should be recovered.

**6. Debtors are not entitled to treble damages.**

Debtors' counsel in her trial brief and oral argument portray the Dayani brothers and their related entities as loan sharks preying on innocent borrowers, and she asks the court to punish them by trebling the amount of interest paid in the last year before and up to the sale of the Property. She concedes, however, that such an award is solely a matter of discretion and not mandatory as a matter of law.

The court will not impose such a drastic remedy. Regardless of what Debtors and their counsel believe, the facts presented show the Dayani brothers' businesses as successful and them as generally careful businessmen. Here, however, they were careless in their drafting and in their communicating to Debtors, nothing more. The usury laws present a minefield that people in the Dayani brothers' position, with their and Dayco's status as licensed brokers, can readily navigate. This time they did not navigate carefully. The court has little doubt that Debtors would have taken Option Three had Dayco been identified and in fact had acted as Penn's agent from the outset. And clearly Dayani could have memorialized in writing and in fact what he stated at trial was his intention, namely that Dayco act for Penn. He did not, and it did not.

The court cannot reach a result based upon what might - indeed should - have happened, but only upon what DID happen. The

-25-

1  Dayani brothers and their two companies chose not to seek
2  independent legal advice, or even apply their own legal training,
3  nor did they cross their T's or dot their I's carefully, but they
4  should not be punished beyond the very significant result of Penn
5  having to repay all of the interest it received plus Debtors'
6  attorneys fees and costs.[11]

7  **7. Penn may be entitled to an offset.**

8       From the foregoing it is clear that the court must eliminate
9  the usurious interest paid by Debtors to Penn.  It is not so
10 obvious that Penn is not entitled to a non-usurious rate of
11 interest accruing after maturity.  The CIBC Note, held by Penn,
12 was extended to a new maturity date of October 15, 2013, (Exhibit
13 ZZ).  Accordingly, Penn may be entitled to recover by way of
14 offset interest at the maximum non-usurious default rate from
15 October 31, 2013 until January 23, 2015, the date the Property was
16 sold.

17      The principle the court considers is drawn from *Epstein v.*
18 *Frank*, 125 Cal. App. 3d 111 (1981).  In that case the court framed
19 the question as follows: Is the payee of a usurious note entitled
20 to recover post-maturity interest?

21      In answering the question in the affirmative, the court
22 stated:

23           "The denial of interest up until the maturity of the
24           note is a sufficient deterrent against the exacting of

---

25      [11] In her post trial brief Debtors' counsel continued her
   unfounded attack on Penn and Dayco by mentioning their "standard
26 business model" and a "stunning foreclosure rate of 90%" with
   absolutely no support for those statements in the record.  The
27 court admonishes her for such inappropriate remarks at this point
   in the proceedings, and cautions against the possibility of
28 sanctions for any further conduct of this nature.

Case: 13-32456   Doc# 235   Filed: 09/28/15   Entered: 09/28/15 16:20:04   Page 26 of
29

> usurious interest. The payee, notwithstanding the
> usury, has the right to recover the principal of the
> note in full on the date of its maturity. If the
> obligor improperly withholds payment of this obligation
> it is neither unjust nor contrary to policy that he be
> chargeable with interest at the legal rate from the date
> he was obligated to pay the note until the date he
> discharges that obligation, or to the date a judgment is
> rendered against him."

125 Cal. App. 3d at 123.

Penn did not say anything about this offset, or even cite *Epstein*, in its trial brief, but it did mention the case and the possibility of such a recovery in its closing argument. Debtors had no warning about this possibility. Accordingly, the court desires further briefing on the following limited issues:

> Can a party forced to repay usurious interest paid
> before and after maturity claim an offset for post-
> maturity interest at a lawful rate of interest from the
> date of maturity, October 31, 2013, to the date of
> payment January 23, 2015? If so, what is the correct
> rate, seven or ten percent?

The parties are to submit simultaneous briefs, not to exceed seven pages, on this limited issue on October 9, 2015.

IV. DISPOSITION

Once the additional briefs have been filed and considered the court will issue a decision on the remaining issues. Then counsel for Debtors should prepare, serve and upload an order and judgment in favor of Debtors and against Penn in the amount of 1,375,847 (perhaps reduced in an amount to be decided by the court) for the reasons stated in this Memorandum Decision and any subsequent decision, with an award of attorneys fees and costs to be the subject of a post-judgment motion in accordance with Civil L.R. 54-5, made applicable by B.L.R. 1001-2(a).

-27-

```
 1                    * * * END OF MEMORANDUM DECISION * * *
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

-28-

| | |
|---|---|
| 1 | Service List |
| 2 | Judith J. Rentschler, Esq. |
| | Rentschler/Tursi LLP |
| 3 | 411 Borel Avenue - Suite 510 |
| | San Mateo, CA 94402 |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

-29-